MORRIS A. SHENKER and LILLIAN K. SHENKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Shenker v. Commissioner
Docket No. 9961-77.
United States Tax Court
T.C. Memo 1985-301; 1985 Tax Ct. Memo LEXIS 333; 50 T.C.M. (CCH) 189; T.C.M. (RIA) 85301; June 24, 1985. James F. Nangle, Jr., for the petitioners. Henry C. Lowenhaupt, for petitioner, Lillian K. Shenker, as of June 5, 1985. James F. Kidd and Robert R. Rubin, for the respondent. WILES
*334 MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioners' Federal incomes taxes: Year
Deficiency
1964
$473.00
1965
925.00
1966
99,461.00
1967
130,359.00
1968
77,262.00
1969
16,237.00 After concessions, the primary issue for decision is whether petitioner, Morris A. Shenker, acquired an ownership interest in various buildings, entitling him to claim deductions attributable to the respective properties. We will also consider petitioner Lillian K. Shenker's motion for supplemental hearing filed with the Court April 5, 1985. FINDINGS OF FACT Morris A. Shenker and Lillian K. Shenker, husband and wife, resided in St. Louis, Missouri, when they filed their petition herein. Petitioners filed joint Federal income tax returns for their 1964, 1965, 1966, 1967, 1968, and 1969 taxable years with the Internal Revenue Service Center in Kansas City, Missouri. Petitioner Lillian K. Shenker, is a party herein solely because she filed joint returns with her husband for the years in issue. Hereinafter all references to "petitioner" refer to Morris A. Shenker. Petitioner is an attorney *335 specializing in criminal law who has actively practiced law in the St. Louis area for approximately 50 years. In or about 1964, petitioner first represented Irvin J. Kahn (hereinafter Kahn) involving Parkway Bowl, a bowling alley in which Kahn was a partner. In this regard, petitioner obtained the loan for Kahn from the Teamsters Pension Fund in Chicago, Illinois. Throughout the years in issue, Kahn was the head of "Irvin J. Kahn Organization," a corporation providing accountants, lawyers, computer facilities, and other miscellaneous administrative services to about 75 business entities owned and operated by Kahn and others (hereinafter referred to as the Kahn Organization). There were 25 to 40 accountants, some of whom were certified public accountants, on the staff. From 1964 through Kahn's death on September 10, 1973, petitioner represented Kahn in matters relating to various business entities owned or controlled by Kahn. Throughout the years, petitioner and Kahn became close friends. During the years in issue, petitioner invested in various real estate projects owned or controlled by Kahn. As is relevant to the case herein, petitioner became involved in the following *336 three projects located in San Diego, California: The Electronics Capital Building, a 23-story office building (hereinafter referred to as ECB); Loma Palisades, an apartment complex; and Pennant Village, a 128-unit apartment complex. From 1964 through 1969, there was a recession in San Diego resulting in a depressed real estate market, which caused each of these projects to go into default. Kahn, in an attempt to keep the projects solvent, contacted petitioner for additional capital. We will discuss the facts surrounding petitioner's involvement in the three projects separately. Electronics Capital Building
Construction of ECB commenced in April 1961 and was completed on May 1, 1963, by its original owner, First and C Corporation (hereinafter F & C). At all relevant times, the stock of F & C was held by four shareholders: Lawrence Holtzman, James S. Murphy, Louis Lesser, and Kahn. [1] Kahn was an officer and director of F & C. Construction of ECB was financed by two loans; one in the amount of $2,700,000 from Fidelity Bank and the other in the amount of $1,100,000 from Pacific Finance Corporation. Upon completion of the project, in August 1963, F & C satisfied the *337 two construction loans with a $4,000,000 permanent mortgage loan from Prudential Insurance Company of America. This loan was secured by a mortgage on ECB and by the personal guarantees of Kahn, Murphy, and Lesser. Within six months, F & C required additional capital and, on March 19, 1964, it obtained a $350,000 loan from Great Universal Development Company, Inc., secured by a second mortgage on ECB. Not long after completion of ECB, F & C was in very serious financial difficulty. Its financial problems were caused by several factors including the depressed real estate market and the announcement of the construction of the two new highrise office buildings. F & C continued to operate ECB at a loss by borrowing money from its shareholders. [2] As a result of mounting operating cash deficits, F & C attempted to negotiate modified payment plans with several of its creditors. F & C's problems became evident when three of its shareholders were no longer financially able to loan additional capital to the corporation. F & C began to default on several of its obligations, and lawsuits *338 were brought against the four shareholders on their personal guarantees. Due to the financial incapacity of the other shareholders, Kahn was called upon in his individual capacity to maintain the continued solvency and operation of F & C. Kahn felt that given the potential liability and lawsuits against the other shareholders no new party would invest in ECB unless legal title to ECB *339 was placed in the name of the Penasquitos Corporation (hereinafter Penasquitos). Penasquitos was a real estate development corporation, controlled by Kahn, with assets totaling in excess of 10 million dollars. At all relevant times, Penasquitos was an ongoing solvent corporation formed to develop approximately 14,000 acres of land within the San Diego limits. On March 4, 1966, F & C deeded ECB to Penasquitos. F & C assigned all ECB leases to Penasquitos. In exchange, Penasquitos assumed all outstanding indebtedness owed by F & C to its various creditors, including the mortgage obligation to Prudential [3], as well as executing a promissory note in the amount of $1,047,779.66 to F & C. This note, which was non-interest-bearing, provided for payment on March 4, 1976, with the option to make partial or full prepayments at anytime. [4] After acquisition of ECB, Penasquitos established bank accounts in its name doing business as ECB. Penasquitos kept the books and records of ECB and managed the day-to-day activities of the building. On March 21, 1966, an agreement, dated March 4, 1966, was executed whereby Penasquitos agreed to act as an agent for Kahn and petitioner for *340 the acquisition and operation of ECB. Kahn and petitioner were undisclosed principals of this agency agreement. Prior to March 4, 1966, petitioner was in no way connected with, nor did he own any interest either directly or indirectly in, ECB. Sometime early in 1966, Kahn, seeking additional capital to bail out ECB, approached petitioner. Petitioner was willing to invest in *341 ECB. In this capacity, petitioner arranged for a $250,000 loan from the State Bank and Trust Company of Wellington to Penasquitos on June 23, 1966. This loan was evidenced by a $250,000 note from Penasquitos secured by a first deed of trust on two parcels of land, by petitioner's and Kahn's personal guarantees. During the period March 4, 1966 through April 4, 1967, Penasquitos alone actively managed ECB. Petitioner was not involved in any decisions relating to the operation of ECB. On April 4, 1967, an agreement was executed between Penasquitos, petitioner, and Kahn. The agreement generally provided that petitioner and Kahn (1) terminated the agency relationship with Penasquitos; (2) agreed to hold Penasquitos harmless for any and all claims arising from or connected with Penasquitos's operation of ECB; and (3) assumed all liabilities and obligations incurred by Penasquitos in operating ECB. That same day, Sidney Wyman and Charles Rich allegedly acquired Kahn's interest in ECB. Pursuant to an agreement, each of them purchased an undivided twenty-five percent interest in ECB for the amount of $200,000 which was previously advanced to Kahn. [5] In April 1967, Penasquitos *342 deeded legal title to ECB to Title Insurance and Trust Company of San Diego (hereinafter Title Company). About the same time, petitioner, Rich, and Wyman, executed a holding agreement with the Title Company which provided that the Title Company would hold title to ECB as an agent for them. [6]
After April 1967, ECB was supposedly operated by the Kahn organization and/or Penasquitos. [7] Pursuant to an agreement with Rich and Wyman, the Kahn organization received a management fee of fifty percent of the net income from ECB. *343 In June 1967, petitioner arranged a personal loan to Penasquitos for ECB with the Industrial Bank of Binghamton in the amount of $60,000. This loan was personally guaranteed by petitioner and was treated on the books of ECB as a loan from petitioner to the project. The loan proceeds were used to pay $50,000 of principal on the $350,000 note which was subsequently purchased by Thrift Credit Corporation. The Industrial Bank of Binghamton sent petitioner invoices for interest due on the $60,000 loan to ECB; however, these bills were not paid by petitioner, rather, they were paid from ECB's bank account. On November 8, 1967, an additional loan was obtained from the Thrift Credit Corporation in the amount of $100,000. This loan was secured by a deed of trust executed by petitioner, Wyman, and Rich and the original deed of trust to the Title Insurance and Trust Company dated March 19, 1964. In order to meet its operating expenses ECB borrowed $100,000 from Wyman on December 15, 1967, which was to be returned in 45 days. On that same day, ECB paid petitioner $50,000 and on December 29, 1967, ECB paid petitioner an additional $45,000. ECB filed U.S. Partnership returns (Forms *344 1065) for the taxable years ending 1966, 1967, 1968, and 1969, reporting losses in the amounts of $337,367.84, $351,315.59, $114,969.31, and $162,117.00, respectively. During each year in issue, petitioner was listed as a partner on ECB's partnership returns along with Kahn and/or Wyman and Rich. [8]
On his 1966, 1967, 1968, and 1969 Federal income tax returns, petitioner claimed his distributive share of ECB's losses in the respective amounts of $168,684, $171,925, $53,612, and $75,417. Loma Palisades
Construction began on the apartment complex known as Loma Palisades Apartments during 1958 and was completed by the end of 1959. Loma Palisades Apartment complex (Loma Apartments) was divided into five units designated A through E, each unit being put into a separate corporation (hereinafter the five separate corporations are collectively referred to as the Loma corporations). *345 Financing for the project was accomplished with mortgage guarantees provided by the Federal Housing Administration (hereinafter FHA). The FHA insured five mortgages aggregating $6,292,100. From the onset, the apartment complex was plagued by a high vacancy factor, approaching 40 percent. Because of the lack of tenants, rental payments did not meet expectations and the mortgages guaranteed by the FHA went into default. In about 1960, the Loma corporations commenced negotiations with the Kahn Organization for sale of their common stock. In the latter part of 1960, Kahn and certain others, through a corporation known as University City, acquired ownership and control of the project by purchasing the stock of the Loma corporations.In 1964, ownership and control of University City was transferred to a group headed by Mr. Carlos Tavares (hereinafter Tavares). The FHA was notified on January 22, 1965, that the principal shareholders of University City (which owned the Loma corporations) were Tavares, Louis Lesser, and C. W. Carlstrom. In 1966, the project again went into default, and on June 3, 1966, a complaint was filed in the United States District Court for the Southern *346 District of California, Southern Division, against Loma Palisades, Inc., and Title Insurance and Trust Company. By order dated June 13, 1966, the court appointed a temporary receiver for each of the five Loma corporations. During the pendency of the receivership, the receiver managed the Loma Apartments, including the collection of all income and payment of all expenses. On April 5, 1967, each Loma corporation contracted to sell petitioner and 220 North Kings Highway, Inc.[9] (hereinafter 220, Inc.), its respective apartment units. In turn, petitioner and 220, Inc., agreed to cure existing delinquency on the mortgages guaranteed by the FHA and to assume the existing unpaid balances of the five mortgages on the property. On April 11, 1967, deeds conveying Loma Apartments to petitioner and 220, Inc. were executed by each of the Loma corporations and delivered to petitioner. Pursuant to the sales contract of April 5, petitioner tendered to the FHA a cashier's check dated that same day in the amount of $200,000 to cure the delinquency on the five mortgages. The check was drawn *347 on the First National Bank of St. Louis by 220, Inc. By letter dated April 12, 1967, Harry L. Johnson submitted an application to the FHA for the transfer of the physical assets of Loma Apartments from the Loma corporations to petitioner and 220, Inc. Enclosed with the letter were copies of the deeds executed on April 11, copy of the sales contract dated April 5, and the cashier's check in the amount of $200,000, dated April 5. The FHA, however, did not cash the check for over a year. On August 15, 1967, the receiver paid to the State of California taxes totaling $29,886.12 on the gains reported on the April 11 transfer of the properties by Loma corporations to petitioner and 220, Inc. On November 3, 1967, petitioner and 220, Inc., received preliminary approval from the FHA on the transaction. The deeds executed on April 11, 1967, were recorded on June 26, 1968. On July 3, 1968, the receiver approved the transfer and the receivership was terminated shortly thereafter. U.S. Partnership returns (Forms 1065) were filed for Loma Palisades for the 1967 and 1968 taxable years reporting losses in the amounts of $223,933.74 and $251,834.57, respectively. During each year *348 in issue, petitioner was listed as a partner on Loma Palisades partnership returns. [10] On petitioner's 1967 and 1968 Federal income tax returns, petitioner claimed his distributive share of the losses arising from the operation of Loma Palisades in the respective amounts of $111,967 and $67,606.02. Pennant Village
Pennant Village, a California corporation, was incorporated on July 16, 1964, to construct an apartment complex located in San Diego, California. [11] Pennant Village obtained a $2,000,000 loan for permanent financing of the project from Fidelity Bank of Beverly Hills, California. This loan was insured by the FHA and secured by a deed of trust giving Fidelity Bank a first mortgage on the property. Additional security for the loan was provided by Kahn and Tavares who jointly and severally guaranteed the loan to Fidelity Bank for two years following the date *349 of the first payment on the note. On or after February 1, 1966, Pennant Village went into default. The mortgagor brought suit against the corporation demanding payment of the delinquent amounts and possession of the property and, in the interim, appointment of a receiver to take over operation of the apartment complex. On May 25, 1966, Herman A. Bischoff was appointed receiver by the court. During the pendency of the receivership, the receiver managed the property including collection of all rents and payment of all expenses. On August 10, 1967, the FHA was substituted as plaintiff in the suit against Pennant Village Corporation. The FHA threatened foreclosure on Pennant Village if the mortgage was not properly brought up to date. Between November 8, 1966 and December 14, 1966, Kahn and the FHA corresponded a number of times pursuing ongoing negotiations of the resolution of the Pennant Village situation. During the same time, petitioner was induced by Kahn to provide *350 capital and assist Kahn in bailing out the Pennant Village project. In a letter dated December 7, 1966, Kahn advised the FHA that he and petitioner would cure default and that title to the property would be transferred to them. On December 12, 1966, Pennant Village Corporation executed and delivered a corporation grant deed conveying the Pennant Village property to petitioner and Kahn. This deed was properly recorded on December 14, 1966. On December 16, 1966, petitioner and Kahn each paid $7,520.35 to the FHA, and again in January 1967, petitioner and Kahn each made additional payments to the FHA each in the amount of $7,520.35. In May 1967, Kahn transferred his one-half interest in Pennant Village to the Title Company (which also held legal title to ECB) for the benefit of Wyman and Rich. In exchange for the one-half interest in Pennant Village, Wyman and Rich each made payments totaling $100,000 to ECB. On June 7, 1967, Kahn forwarded a check in the amount of $40,000 to the FHA in order to cure the default. Kahn also informed the FHA that he had transferred his remaining one-half interest in Pennant Village to the Title Company for the benefit of Wyman and Rich. *351 By letter dated June 8, 1967, to Kahn, the FHA accepted Kahn's check as performance on his guarantee and informed Kahn that they would entertain an application to transfer the Pennant Village property to petitioner. On July 14, 1967, Harry L. Johnson submitted an application for transfer of Pennant Village from the Pennant Village Corporation by Wyman, Rich, and petitioner. The FHA returned the application by letter dated August 4, 1967, and it was resubmitted by letter dated September 18, 1967. The FHA never formally approved the application for transfer of Pennant Village to petitioner. On January 2, 1969, petitioner, Wyman, and Rich executed a deed conveying a two-thirds interest in the Pennant Village property to B.A.I., Inc., and a one-third interest in the Pennant Village property to Shelter Island Hotel Corporation. [12] On March 31, 1969, B.A.I., Inc., executed a deed conveying its interest in the Pennant Village property to Shelter Island Hotel Corporation. [13] On June 20, 1969, Shelter Island Hotel Corporation transmitted a check in the amount of $30,299.68 to the FHA to bring the Pennant Village mortgage current. By deed dated June 23, 1969, Shelter Island *352 Hotel Corporation conveyed its interest in the Pennant Village property back to Pennant Village Corporation. This deed was recorded on June 24, 1969. On July 28, 1969, the receiver to return possession of Pennant Village to Pennant Village Corporation. U.S. Partnership Returns (Forms 1065) were filed on behalf of Pennant Village for the 1967 and 1968 taxable years reporting losses in the respective amounts of $74,2470.20 and $55,922.31. During the years in issue, petitioner was listed as a partner on Pennant Village partnership returns. [14] Petitioner deducted his distributive share of the losses attributable to the operation of Pennant Village apartments on his 1967 and 1968 Federal income tax returns in the amounts of $37,135 and $27,961, respectively. *353 OPINION The primary issue for decision is whether petitioner acquired an ownership interest in ECB, Loma Palisades, or Pennant Village, entitling him to claim deductions attributable to the respective properties. In order to claim deductions attributable to property, petitioner must have assumed the benefits and burdens of ownership. Houchins v. Commissioner,79 T.C. 570 (1982). Whether the benefits and burdens of ownership have been transferred is a factual question which requires an analysis of each transaction. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981). See TennesseeNatural Gas Lines v. Commissioner,71 T.C. 74 (1978). Relevant factors to be considered in making this determination are: (1) Whether legal title to the property passed; (2) the manner in which the parties treat the transaction; (3) whether the purchaser acquired equity in the property; (4) whether the purchaser bears a risk of economic loss; (5) whether the purchaser exercises control over the property; and (6) whether the purchaser receives benefits from operation or disposition of the property. Houchins v. Commissioner,supra at 591. *354 In the instant case, a determination of whether petitioner assumed the benefits and burdens of ownership will require separate analysis of the facts and circumstances surrounding petitioner's involvement in each project. Electronics Capital Building
During the years in issue, title to ECB was held by Penasquitos from March 4, 1966 through April 4, 1967. Petitioner argues that Penasquitos and the Title Company were acting as his agents in holding title to and managing ECB. Thus petitioner concludes that he, as an undisclosed principal, was entitled to claim his share of the deductions attributable to operating the building. On the other hand, respondent maintains that no agency relationship existed for tax purposes and, therefore, the losses generated by operation of ECB are properly attributable to the corporation holding title. In support of his position, petitioner relies on the principles articulated in Roccaforte v. Commissioner,77 T.C. 263 (1981), revd. 708 F.2d 986 (5th Cir. 1983), which were reaffirmed in our recent opinion of Ourisman v. Commissioner,82 T.C. 171 (1984), vacated 760 F.2d 541 (4th Cir. 1985), *355 both Court reviewed opinions. However, petitioner's reliance on these cases is misplaced. We find both Roccaforte and Ourisman to be distinguishable from the case herein. In Roccaforte and Ourisman we carefully considered the issue of whether a corporation will be treated as a nontaxable agent for a partnership. In both cases, usury laws prevented financial institutions from lending money for construction projects to an individual or partnership. In order to obtain the necessary financing, the lender required that the nominal debtor be the corporate nominee of the partnership. Pursuant to a written agreement, the corporation held legal title to the property and executed the necessary documents to secure the financing. In Roccaforte and Ourisman, the creditors regarded the partners as the true owners of the properties. Furthermore, once the projects were completed, the corporations did not actively manage the buildings. Rather, the partnerships managed the day-to-day activities of the buildings. In Roccaforte, we decided that in National Carbide Corp. v. Commissioner,336 U.S. 422, 427 (1949), the Supreme Court established *356 the following six factors to be considered in determining whether a true corporate agency relationship exists: (1) whether the corporation operates in the name and for the account of the partnership; (2) whether the principal is bound by the corporate-agent's actions; (3) whether the corporate-agent transmitted the money received to the partnership; (4) whether receipt of income is attributable to the assets and employees of of the partnership; (5) whether the corporate-agent's relationship with the partnership was dependent on the fact that it was owned and controlled by the partners; and (6) whether the corporation's activities were consistent with the normal duties of an agent. Application of the indicia of agency specified in National Carbide, to the facts of the present case compels us to conclude that neither Penasquitos nor the Title Company acted as petitioner's agent in the acquisition and operation of ECB. In support of his position that Penasquitos was acting as his agent, petitioner produced an agreement dated March 4, 1966, which provides that Penasquitos was acting as an agent for Kahn and petitioner, both undisclosed principals in acquiring EBC. [15] *357 However, it is well established that economic substance of a transaction, rather than its form, controls for Federal tax purposes. Gregory v. Helvering,293 U.S. 965 (1935); Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985); Derr v. Commissioner,77 T.C. 708 (1981). The establishment of a nontaxable corporate agency is not established merely by labels, semantic technicalities, or by executing such an agreement. It is not enough that the parties purport to enter an agency relationship; they must act accordingly. Houchins v. Commissioner,supra.We will examine the facts and circumstances surrounding the transaction to determine whether the economic realities comport with the form. See Frank Lyon Co. v. United States,435 U.S. 561 (1978); Rice's Toyota World, Inc. v. Commissioner,supra;Houchins v. Commissioner,supra.
*358 Particularly in this area, substance over form prevails. On March 4, 1966, Penasquitos purchased ECB from F & C. That day Penasquitos acquired legal title to the property from F & C. In exchange, Penasquitos assumed outstanding indebtedness of over $4,000,000 and executed a note to F & C in the amount of $1,047,779. From March 4, 1966 until at least April 4, 1967, Penasquitos effectively exercised total ownership and control over ECB. In our opinion, the evidence strongly suggests that Penasquitos was acting on its own behalf in the acquisition and operation of ECB and not on account for petitioner. At all relevant times, Penasquitos managed the day-to-day affairs of the corporation, maintained all bank accounts, collected all rents, and paid all bills. In all other respects Penasquitos acted as the true owner of the property. [16]
The second agency factor specified by the Supreme Court in National Carbide is likewise not satisfied. Petitioner, an undisclosed principal, was not bound by the actions of Penasquitos. Unlike *359 in Roccaforte and Ourisman, the creditors were unaware that the corporation was acting on petitioner's behalf. Indeed, undoubtedly the creditors looked toward Penasquitos for satisfaction of the liabilities because Penasquitos was solvent with over $10,000,000 in assets. The third indicia of agency is whether the corporation transmitted its receipts to the purported principal. This factor is clearly not satisfied. Penasquitos maintained the bank accounts for ECB and did not transmit any receipts to petitioner. In fact, while petitioner arranged a $250,000 loan for ECB from the State Bank and Trust Company of Wellington, the proceeds of the loan were directly deposited into Penasquitos's account and not necessarily entirely used to pay ECB debts. All rental receipts and expenses were collected by Penasquitos and deposited immediately into corporate accounts. The fourth factor is whether income received from the project was attributable to the efforts of petitioner. At all relevant times, Penasquitos alone actively managed the ECB and hired employees to act on its behalf. Petitioner took very little active interest in the day-to-day operations of ECB. Unlike *360 Roccaforte and Ourisman the purported agent (Penasquitos), not the principal (petitioner), was actively involved in operating and maintaining the buildings. Accordingly, we must conclude that income realized from the building was attributable to the efforts and the assets of Penasquitos. The fifth National Carbide factor is that the corporate-agent's relationship with the partnership (the purported principal) must not be dependent on the fact that it was owned and controlled by the partners. In both Roccaforte and Ourisman, we concluded that this factor was only one of six indicia of agency that should be considered when determining whether a true agency relationship existed. In both cases, we found that the corporate-agent's relationship with the partners was based, to a certain extent, upon the control which the partners, as shareholders, exercised over the corporation. Nonetheless, we held that the taxpayer established that the corporation acted as the partnership's agent. The Fifth Circuit and the Fourth Circuit reversing our respective decisions in Roccaforte and Ourisman, held that whenever such control is present, as a matter of law, *361 the corporation cannot be found to be an agent of the partnership. In other words, the Fifth and the Fourth Circuits hold that National Carbide's fifth factor is mandatory and absolute. In the instant case, respondent does not dispute that the alleged corporate agent, Penasquitos, was controlled entirely by Kahn. Moreover, during the years in issue, petitioner had absolutely no ownership interest in Penasquitos. Therefore, on the record before us, we find that the purported agent's relationship with petitioner and Kahn, the purported principals, was not based upon common ownership and control. See Moncrief v. United States,730 F.2d 276 (5th Cir. 1984). The fifth factor being satisfied, we need not decide whether to adhere to our position as set forth in Roccaforte and Ourisman, or whether to follow the Fifth and Fourth Circuits' decisions; and, we expressly decline to do so. The sixth factor is whether the corporation's activities were consistent with the normal duties of an agent. Penasquitos's extensive involvement in the day-to-day management and operation of ECB is more an assertion of principalship than agency. Penasquitos alone *362 assumed responsibility for the mortgage and other debts in excess of $4,000,000. Moreover, it created, by execution of its own note, a further obligation for over $1,000,000. We do not believe that an agent would, without compensation, conduct business in this manner. Quite simply, Penasquitos alone assumed the benefits and burdens of ownership. Thus, after careful examination of the economic realities, the totality of evidence indicates that during the period March 4, 1966 through April 4, 1967, Penasquitos was not acting as an agent for petitioner. Accordingly, we hold that petitioner did not acquire the benefits and burdens of ownership and is not entitled to claim deductions attributable to the operation of ECB. We must now consider whether petitioner became an owner, for tax purposes, of ECB after April 4, 1967. Petitioner argues that he acquired an ownership interest in ECB on April 4, 1967, when the title to ECB was transferred from Penasquitos to the Title Company. Respondent maintains that nothing occurred on that date which would give petitioner the benefits and burdens of ownership. We agree with respondent. While the record is unclear as to exactly *363 who, or what entity, had the benefits and burdens of ownership after April 4, 1967, for the reasons set forth below, we are certain it was not petitioner. Several agreements were executed on April 4, 1967, none of which convinces us that petitioner suddenly acquired an ownership interest in ECB. Kahn, Wyman, and Rich executed a sales agreement in which Wyman and Rich allegedly purchased Kahn's interest in ECB for $200,000. [17] That agreement further provided that the Kahn Organization would manage ECB for 50 percent of ECB's net income. On that same day, petitioner, Kahn, and Penasquitos executed an agreement which provided that petitioner and Kahn were terminating the alleged agency relationship with Penasquitos. Shortly thereafter, title to ECB was conveyed by Penasquitos to the Title Company. Finally, sometime between April 4, 1967 and September 5, 1969, petitioner, Rich, and Wyman executed a holding agreement with the Title Company which generally provided that the Title Company would hold title to ECB as their agent. These agreements failed to establish *364 that petitioner obtained an ownership interest in ECB after April 4, 1967. Undoubtedly the Title Company was holding title to ECB as an agent; however, it was not acting as petitioner's agent. As we stated earlier, merely executing an "agency agreement" is not enough to shift the incidence of tax; we are concerned with the economic realities and not the form employed by the parties. Frank Lyon Co. v. Commissioner,supra; Estate of Franklin v. Commissioner,64 T.C. 752 (1975), affd. on other grounds 544 F. 2d 1045 (9th Cir. 1976); Houchins v. Commissioner,supra at 589. There was no significant change in the operation and management of ECB after April 4, 1967, which would indicate that petitioner had an ownership interest in the property. Petitioner was not involved in any management decisions regarding ECB.Moreover, the evidence suggests that the Kahn Organization and Penasquitos were acting on their own behalf in operating ECB. The Kahn Organization and Penasquitos continued to manage ECB, collecting rents, paying bills, and maintaining books and records. The ECB bank account, established by Penasquitos, did not change *365 when the corporation assigned legal title to the holding company. Furthermore, signatory authority over the account remained vested in the offices of Penasquitos at all relevant times. Petitioner argues that during the period April 4, 1967 through 1969, he contributed funds in excess of $1,500,000 to rescue ECB from default and continue its operation. The record, however, simply does not support such a contention. Initially, petitioner arranged a $250,000 loan in 1966 to Penasquitos which he personally guaranteed. In June 1967, petitioner arranged another personal loan to Penasquitos with the Industrial Bank of Binghamton in the amount of $60,000, which petitioner also personally guaranteed. On its books and records, Penasquitos treated this as a loan from petitioner to the project. On November 8, 1967, petitioner arranged an additional loan in the amount of $100,000 secured by a deed of trust executed by petitioner, Wyman, and Rich. On December 15, 1967, ECB paid petitioner $50,000 in satisfaction of a loan to ECB. Later that month, on December 29, ECB paid petitioner an additional $45,000. These facts are as consistent with the finding that petitioner was a creditor *366 of ECB as they are with finding that petitioner was an owner of ECB. Quite simply, we are unable to conclude from the record that petitioner, merely through arranging various loans totaling $410,000 acquired a 50 percent ownership interest in ECB, thereby, entitling him the right to claim interest and depreciation deductions worth tens of thousands of dollars creating loss deductions to "shelter his other income." See Davis v. Commissioner,66 T.C. 260 (1976), affd. 585 F. 2d 807, 815 (6th Cir. 1978), cert. denied 404 U.S. 981 (1979). Accordingly, we hold that during the years in issue, petitioner did not acquire the benefits and burdens of ownership in ECB and, therefore, he is not entitled to claim loss deductions arising from operation of the building. Loma Palisades and Pennant Village
We will first discuss petitioner's involvement with Loma Palisades and then discuss his involvement with Pennant Village. Petitioner argues that he became the owner of Loma Palisades upon delivery and acceptance of the deeds, April 11, 1967. On the other hand, respondent maintains that ownership was not transferred to petitioner *367 prior to July 1, 1968. [18] For the reasons set forth below, we disagree with respondent. Generally, the question of when a sale is complete is a factual one. As we stated in Houchins v. Commissioner,79 T.C. at 590: For purposes of Federal income taxation, a sale occurs upon the transfer of the benefits and burdens of ownership rather than upon the satisfaction of the technical requirements for the passage of title under State law. Under California law, delivery and acceptance of a deed passes full legal title. Cal. Civil Code, sec. 1056 (West 1982). The failure to record a deed does not affect the validity of the deed between the parties thereto and persons who have notice thereof. Devereaux v. Frazier Mountain Park & Fisheries Co.,248 Cal. App. 2d 323, 56 Cal. Rptr. 345 (1967); Belli v. Bonavia,167 Cal. App. 2d 275, 334 P.2d 196 (1959). Also, the granting of a mortgage does not convey title but merely *368 imposes a lien on the property as security for the obligation.Cal. Civil Code, sec. 2920 (West 1974). See Miller and Starr, Current Law of California, Real Estate, sec. 3:2 at 316 (1977). Moreover, of a deed of trust is executed, although legal title technically passes to the trustee, all of the incidents of ownership including the right to possession of the property and the right to transfer or further encumber the property remain with the owner. Miller and Starr, supra secs. 3:2 at 317 and 3:43 at 399. Finally, except for the right of possession, the appointment of a rents and profits receiver does not affect any party's title to property. See 55 Cal. Jur.3d, Receivers, sec. 7 at 14. Prior to the years in issue, title to the Loma Palisades property was held by the Loma corporations subject to mortgages totaling $6,292,100 which was insured by the FHA. The Loma corporations defaulted on their mortgage obligations and, on June 13, 1966, a rents and profits receiver was appointed by the court. On April 5, 1967, each Loma corporation contracted to sell to petitioner and 220, Inc. the apartment complex provided that they cure the existing delinquencies *369 on the mortgages and take subject to the existing mortgages. On April 11, 1967, the Loma corporations executed and delivered deeds to the respective properties to petitioner and 220, Inc.; petitioner and 220, Inc., took the properties subject to the existing mortgages. In exchange, petitioner tendered a cashier's check in the amount of $200,000 to the FHA to cure the default. In contending that the sale was not consummated for tax purposes until July 1, 1968, respondent relies primarily on two points. First, respondent argues that the FHA did not approve the transaction until June 26, 1968, and, second, the court did not approve the transaction until July 3, 1968. Respondent's reliance on these factors is misplaced. While regulatory and court approval may be necessary before clear title to Loma Palisades is passed, for tax purposes a sale is complete when there is a shift of the benefits and burdens of ownership. Moreover, the rents and profits receiver was merely a court custodian for the property and his possession does not in anyway impair or affect underlying title to the property. See Miller & Starr, Current Law of California, Receivers, secs. 22:1 and 22:3, *370 at pp. 621, 624 (1977). On the record before us, we agree with petitioner that for tax purposes the benefits and burdens of ownership of Loma Palisades passed to him on or about April 11, 1967. Among the facts we consider important are: (1) Petitioner obtained legal title to the property subject to the existing mortgages, by a validly executed, delivered, and accepted grant deed; (2) petitioner paid consideration for the property on April 11, 1967, by tendering a cashier's check in the amount of $200,000; (3) on August 15, 1967, the receiver paid taxes totaling $29,886.12 to the State of California on the gains reported on the transfer of the properties by the Loma corporations to petitioner and 220, Inc.; and (4) the economic risk of loss was borne by petitioner. [19] See Houchins v. Commissioner,supra at 591. Accordingly, we hold that for tax purposes petitioner assumed the benefits and burdens of ownership of Loma Palisades on or about April 11, 1967, when he accepted delivery of the deeds. We reach a similar conclusion with respect to *371 the Pennant Village property. Prior to the years in issue, title to the apartment complex was held by Pennant Village Corporation subject to a $2,000,000 mortgage insured by the FHA and secured by a deed of trust. Pennant Village Corporation defaulted on its mortgage and on February 25, 1966, a receiver was appointed. On December 12, 1966, after notice to the FHA, Pennant Village Corporation delivered a deed conveying the property to petitioner. On the record before us, we conclude that on or about December 12, 1966, petitioner assumed the benefits and burdens of ownership. We base our conclusion on the following facts: Petitioner obtained legal title, subject to the existing mortgages, to the property on that date; petitioner paid various amounts to the FHA to cure default on the existing mortgages; and petitioner assumed the risk of economic loss on the property. [20] See Houchins v. Commissioner,supra at 591. We note that petitioner transferred his interest in Pennant Village on January 2, 1969.Petitioner concedes that this was a taxable event. Accordingly, *372 we hold that petitioner is entitled to claim deductions attributable to Pennant Village only during the period December 12, 1966 through January 2, 1969. Motion For A Supplemental Hearing
The final matter for resolution is petitioner Lillian K. Shenker's (Lillian) motion for a supplemental hearing filed with the Court April 5, 1985. Seeking relief under newly amended section 6013(e), [21] the innocent spouse rule, Lillian moved this Court to hold additional hearings to present evidence concerning her lack of knowledge of the understatement of tax attributable to deductions claimed by petitioner, her husband, on their joint income tax returns filed for each year in issue. Respondent objects to the motion, arguing that petitioners' deductions are not "grossly erroneous items" as defined in section 6013(e)(2)(B) and, therefore, Lillian is not entitled to relief as a matter of law. *373 Even were we to assume that Lillian otherwise qualifies as an "innocent spouse" under section 6013(e), we agree with respondent that, as a matter of law, petitioners' claimed deductions are not "grossly erroneous items" as defined in section 6013(e). Section 6013(e)(2) provides, in pertinent part: The term "grossly erroneous items" means, with respect to any spouse-- (B) any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in fact or law. [Emphasis added.] The Committee on Ways and Means Report states that relief to an innocent spouse may be desirable in situations such as "where one spouse claims phony business deductions in order to avoid paying tax and the other spouse has no reason to know that the deductions are phony and may be unaware that there are untaxed profits from the business which the other spouse has squandered." Committee on Ways and Means, H. Rept. 98-432, Part 2, 98th Cong., 2d Sess., 1502. Accord, Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 720, 721 (J. Comm. Print 1984) In the instant case, petitioner's claimed deductions were *374 not phony business deductions for which there was "no basis in fact or law." On his joint income tax returns, petitioner claimed deductions that were attributable to three properties, ECB, Loma Palisades, and Pennant Village. The deductions claimed were not frivolous or fraudulent; indeed, the expenses giving rise to the deductions were in fact incurred and were deductible under various provisions of the Internal Revenue Code. The primary legal issue before us was whether petitioner had a sufficient ownership in the respective properties entitling him to claim the deductions. Although we found that petitioner was not entitled to deduct expenses attributable to ECB, his claim to do so was not without legal basis. [22] In fact, no additions to tax were ever determined by respondent. Therefore, we hold the deductions petitioners claimed on their joint income tax returns, do not constitute "grossly erroneous items" under the statute. Accordingly, because Lillian is not entitled to relief as a matter of law, her motion for a supplemental hearing is denied. To reflect the foregoing and concessions *375 by both parties, Decision will be entered under Rule 155.
Footnotes
1. Kahn, Lesser, and Murphy each owned 15,100 shares while Holtzman owned 9,100 shares.↩
2. For the year ending April 30, 1965, F & C had a cash deficit of over $400,628. F & C sustained a $221,692.33 net operating loss on ECB for the 8-month period ending December 31, 1965. By February 16, 1966, F & C had the following liabilities (rounded): Creditor
Amount
Prudential
$3,896,177
Great Universal
350,000
Southland Savings
55,673
Westinghouse Credit Corp.
216,960
Associates Discount
35,749
C. H. Masland & Sons
21,328
Delinquent Taxes, penalties and
interest
87,414
Reserve for additional tenants
improvements
150,000
To keep F & C solvent, the shareholders advanced money to the corporation in the following amounts: ↩
Shareholder
Amount Advanced
Kahn
$ 239,005.60
Lesser
736,674.01
Murphy
183,214.46
$1,158,894.07
3. Pursuant to paragraph 4 of the sales agreement executed on March 4, 1966, Penasquitos "assumes and agrees to pay all delinquent amounts of principal, interest, penalties and costs in connection with encumbrances of record against * * * [ECB] * * *. In addition, paragraph 7 provides "the total consideration for * * * [ECB] * * * is agreed to be the aggregate of the following, calculated as of the date hereof: A. Principal and accrued but unpaid interest owing to The Prudential Insurance Company of America; * * *." ↩
4. On March 4, 1966, F & C assigned Louis Lesser Enterprises, Inc., a $798,774.01 interest in Penasquitos's note and assigned Kahn a $249,005.65 interest in the note. On August 16, 1968, all rights, title, and interest in Penasquitos's note was transferred to Kahn without recourse.↩
5. The agreement further provided that the Kahn organization would manage ECB for fifty percent of the net income generated by ECB. The organization was appointed as an agent for Rich and Wyman, responsible for the operation and management of ECB, including collecting rents, opening of new bank accounts, and making payments on existing encumbrances. ↩
6. The record is ambiguous as to when this holding agreement was actually executed. From the record before us, we conclude that the agreement was executed sometime between April 4, 1967 and September 5, 1969.↩
7. The record, however, is somewhat ambiguous as to which corporation actually operated ECB after April 4, 1967. There is some indication that Penasquitos continued to manage ECB. ECB's checking account, which was established on March 4, 1966, remained unchanged after April 4, 1967. In addition, Penasquitos made payments on ECB's loans from Industrial Bank of Binghamton, Thrift Credit Corporation, and petitioner.↩
8. No partnership agreements were ever executed by the partners. Respondent has conceded, however, that if petitioner is found to have acquired an ownership interest in ECB, his claimed losses will not be denied because of the absence of either a partnership agreement or sufficient basis.↩
9. 220 North Kings Highway, Inc., was a corporation owned by petitioner's wife's family.↩
10. No partnership agreements were ever executed by the partners. Respondent has conceded, however, that if petitioner is found to have acquired an ownership interest in the Loma Apartments, his claimed losses will not be denied because of the absence of either a partnership agreement or sufficient basis.↩
11. Pennant Village Corporation was a wholly owned subsidiary of University City. Petitioner was not a shareholder, officer or director of either Pennant Village Corporation or University City.↩
12. Petitioner owned fifty percent of the stock of the Shelter Island Hotel Corporation. ↩
13. Thereafter Shelter Island Hotel Corporation possessed a 100 percent interest in the Pennant Village property.↩
14. No partnership agreements were ever executed by the partners. Respondent has conceded, however, that if petitioner is found to have acquired an ownership interest in Pennant Village, his claimed losses will not be denied because of the absence of either a valid partnership or sufficient basis.↩
15. We note, however, that the record shows that this agreement was actually executed on or about March 21, 1966, and was predated March 4.↩
16. See Raphan v. United States,3 Cl. Ct. 457 (1983), revd. in part and affd. in part 759 F.2d 879↩ (Fed. Cir. 1985).
17. The $200,000 represented the amount Wyman and Rich advanced to Kahn sometime prior to April 4, 1967.↩
18. Apparently respondent chooses this date because it is between June 26, 1968, the date the deeds were recorded, and July 3, 1968, the date the receiver approved the transfer.↩
19. See Milbrew, Inc. and Amber Laboratories v. Commissioner,T.C. Memo. 1984-573↩.
20. See Milbrew, Inc. and Amber Laboratories v. Commissioner,supra.↩
21. Section 6013(e) was amended by Pub. L. No. 98-369, 98 Stat. 801, The Deficit Reduction Act of 1984, to, among other things, expand the circumstances in which an "innocent spouse" may obtain relief from tax liability. The provisions apply to all taxable years to which the Internal Revenue Code of 1954 applies, and it was intended to provide relief to an innocent spouse in "any pending court case where the decision in that case is not final." Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 (Pub. L. 98-369), at 720, 721 (J. Comm. Print 1984).↩
22. See Neary v. Commissioner,T.C. Memo. 1985-261↩.