**Morris A. SHENKER and Lillian K. Shenker, Appellant,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

Nos. 85–2322, 86–1176.

United States Court of Appeals, Eighth Circuit.

Submitted June 13, 1986.

Decided Oct. 27, 1986.

Hugh R. Law, St. Louis, Mo., for appellant.

Teresa E. McLaughlin, Washington, D.C., for appellee.

Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and ARNOLD, Circuit Judge.

ARNOLD, Circuit Judge.

Lillian K. Shenker appeals from two decisions of the United States Tax Court that determined deficiencies in her joint federal income tax liability with her husband, Morris A. Shenker.[1] In both cases, the Tax Court disallowed deductions claimed for losses suffered in the course of Morris Shenker's business dealings; Lillian Shenker was a party to these proceedings solely by virtue of having signed joint income tax returns with her husband. Mrs. Shenker's principal argument on appeal is that the Tax Court erroneously held in each case that she was not entitled to relief from liability under the "innocent spouse" rule of § 6013(e), Internal Revenue Code of 1954, as amended, 26 U.S.C. § 6013(e).[2] We affirm in part and reverse in part.

## I.

In the first case, the Tax Court, *inter alia*, disallowed deductions claimed on the Shenkers' 1966, 1967, 1968, and 1969 joint returns for losses suffered in the operation of a San Diego, California office building known as the Electronics Capital Building (ECB). 50 T.C.M. (CCH) 189 (1985). The Court found that Mr. Shenker did not, as he contended, have any ownership interest in ECB, and therefore held that he could not claim any share of ECB's losses as a deduction.

## A.

ECB has a tangled financial and ownership history. The building was completed in May 1963 by its original owner, First &

---

1. Morris Shenker has not appealed either decision.

2. All sections cited refer to the Internal Revenue Code of 1954, unless otherwise indicated.

C Corporation (F & C), a corporation whose stock was held by Irvin J. Kahn and three other shareholders. ECB operated at a loss, and F & C found itself in serious financial straits soon after the building's completion. Eventually, despite loans of over $1 million from its shareholders, F & C began to default on its obligations. Kahn, who had personally guaranteed payment of the $4 million primary mortgage on ECB, was called upon to maintain F & C's solvency. To resolve these financial difficulties and to facilitate finding new investors in the venture, Kahn arranged to have F & C transfer its interest in ECB to Penasquitos Corporation, a real estate development corporation controlled by Kahn with assets exceeding $10 million. This transfer occurred March 4, 1966. For its part, Penasquitos assumed all of F & C's outstanding indebtedness and executed a ten-year no-interest note to F & C for approximately $1 million.

Irvin Kahn was a long-time friend and client of Morris Shenker, who is an attorney, and Mr. Shenker had participated in a number of Kahn's real estate ventures. At some point in early 1966, Kahn approached Mr. Shenker concerning investment in ECB. On March 21, 1966, an agreement dated March 4, 1966, was executed in which Penasquitos agreed to act as agent for Kahn and Shenker, as undisclosed principals, in the operation and acquisition of ECB. Mr. Shenker arranged for a $250,000 loan from the State Bank and Trust Company of Wellington to Penasquitos on June 23, 1966. This loan was evidenced by a $250,000 note from Penasquitos and was secured by a first deed of trust on two parcels of land and by the personal guarantees of Kahn and Mr. Shenker. From March 4, 1966 through April 4, 1967, Penasquitos alone actively managed ECB; Penasquitos established bank accounts in its name doing business as ECB, kept ECB's books and records, and managed ECB's day-to-day operations. Mr. Shenker was not involved in any decisions concerning ECB operations.

On April 4, 1967, Mr. Shenker, Kahn, and Penasquitos executed a new agreement providing that Mr. Shenker and Kahn terminated Penasquitos's agent status, agreed to hold Penasquitos harmless from all claims connected to its operation of ECB, and assumed all liabilities and obligations incurred by Penasquitos in operating ECB. That same day, Sidney Wyman and Charles Rich entered an agreement with Kahn under which each acquired a 25 per cent. interest in ECB from Kahn in exchange for $200,000 previously advanced to Kahn. This agreement also authorized another entity controlled by Kahn, the Kahn Organization, to act as Wyman's and Rich's agent in operating and managing ECB, in return for a fee of 50 per cent. of ECB's net income. After April 1967, Wyman and Rich paid this fee to the Kahn Organization, but it appears that Penasquitos continued to play some role in ECB's operation.

Also in April 1967, Penasquitos conveyed legal title to ECB to the Title Insurance and Trust Company of San Diego (Title Company). While the precise date is unclear, at some point between April 4, 1967 and September 5, 1969, Mr. Shenker, Wyman, and Rich executed an agreement with the Title Company providing that the Title Company would hold title to ECB as an agent for them.

In June 1967, Mr. Shenker arranged for a $60,000 loan from the Industrial Bank of Binghamton to Penasquitos for ECB. Mr. Shenker personally guaranteed this loan, which was treated on ECB's books as a loan from Mr. Shenker. The Industrial Bank of Binghamton billed Mr. Shenker for interest due on the loan, but ECB paid these bills. On November 8, 1967, a $100,000 loan was obtained from Thrift Credit Corporation. This obligation was secured by a deed of trust executed by Mr. Shenker, Wyman, and Rich, and by the original deed of trust to the Title Company. On December 15, 1967, ECB borrowed $100,000 from Wyman. That same day, ECB paid Mr. Shenker $50,000; on December 29, 1967, ECB paid him an additional $45,000.

In 1966, 1967, 1968, and 1969, ECB filed partnership returns reporting losses rang-

ing from about $115,000 to about $362,000. Each year, Mr. Shenker was listed as a partner, along with Kahn and/or Wyman and Rich. Mr. Shenker claimed a distributive share of 50 per cent. of these losses on the returns he filed jointly with Mrs. Shenker during the years in issue. The Commissioner of Internal Revenue disallowed the deductions on the ground that they were allocable to Penasquitos or the Title Company. Mr. and Mrs. Shenker challenged his ruling in the Tax Court, arguing that Penasquitos and the Title Company were merely acting as Mr. Shenker's agents in holding title to and managing ECB.

Examining the facts and circumstances presented above with an eye towards economic substance rather than form, the Tax Court concluded that Mr. Shenker had never assumed the benefits and burdens of ownership of ECB, and that neither Penasquitos nor the Title Company had acted as his agent in the acquisition and operation of ECB. 50 T.C.M. at 194–97. Analyzing Mr. Shenker's relationship with Penasquitos by reference to factors identified by the Supreme Court in *National Carbide Corp. v. Commissioner*, 336 U.S. 422, 437, 69 S.Ct. 726, 734, 93 L.Ed. 779 (1949), for use in determining whether a corporation had acted as an agent or on its own behalf, the Tax Court found that Penasquitos had acted on its own behalf, and that it alone assumed the benefits and burdens of ownership. The Court further found that nothing occurred at the time of or after the transfer of title to ECB from Penasquitos to the Title Company that gave Mr. Shenker an ownership interest in ECB. The Court summed up its view of the evidence by stating: "Quite simply, we are unable to conclude from the record that [Mr. Shenker], merely through arranging various loans totaling $410,000 acquired a 50 percent ownership interest in ECB." 50 T.C.M. at 197. The Court went on to deny Mrs. Shenker's motion for a supplemental hearing to establish her right to relief un-

der § 6013(e)'s innocent-spouse rule on the ground that the ECB deductions were not "grossly erroneous items" as required by § 6013(e)(2)(B).

### B.

Lillian Shenker argues first, that the Tax Court erred in applying the factors enumerated in *National Carbide* to her husband's relationship with Penasquitos, and second, that if this was not error, the ECB deductions were grossly erroneous and she is entitled to an opportunity to establish the remaining requirements for relief under § 6013(e). We disagree with both arguments.

### 1.

■ Mrs. Shenker correctly observes that the Supreme Court in *National Carbide* addressed the question under what circumstances one who owns or controls a corporation may successfully argue that the corporation has acted as his agent, rather than on its own behalf in conducting a transaction, thereby avoiding taxation of the corporation on the income from the transaction. 336 U.S. at 424, 69 S.Ct. at 727; see also *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436, 438–39, 63 S.Ct. 1132, 1133–34, 87 L.Ed. 1499 (1943). Here, in contrast, there is no contention that Mr. Shenker owned any part of Penasquitos. Concern that taxpayers may make use of the corporate form's advantages while avoiding its tax disadvantages, see *Moline*, 319 U.S. at 438–39, 63 S.Ct. at 1132–33, are therefore of limited relevance to this case.[3]

While *National Carbide* is thus not perfectly analogous to the case before us, the Supreme Court in that case nonetheless elaborated factors that are, with one exception, of general applicability in determining whether a corporation has acted as another's agent or for its own benefit. The factors identified in *National Carbide* were: (1) whether the corporation operates

---

**3.** The present dispute would be more nearly analogous to *National Carbide* if Kahn's tax liability, rather than Mr. Shenker's, were at issue.

Kahn, unlike Mr. Shenker, was a shareholder in Penasquitos.

in the name and for the account of the principal; (2) whether the principal is bound by the corporate agent's actions; (3) whether the corporate agent transmitted the money received to the principal; (4) whether receipt of income is attributable to the assets and employees of the principal; (5) whether the corporate agent's relationship with the principal was dependent on the fact that it was owned and controlled by the principal; and (6) whether the corporation's activities were consistent with the normal duties of an agent. 336 U.S. at 437, 69 S.Ct. at 734.

Of these, only the fifth factor is not relevant to determining whether a corporation has acted as the agent of a non-owner principal such as Mr. Shenker. Further, the Tax Court without hesitation resolved this factor in Mr. Shenker's favor, finding that since Mr. Shenker had no ownership · interest in Penasquitos it was not possible that his relationship with Penasquitos was based on common ownership or control. 50 T.C.M. at 196. On the other hand, under the Tax Court's analysis of the remaining five factors, each indicated that Penasquitos had acted on its own behalf, rather than as Mr. Shenker's agent.[4] *Id.* at 195-96.

We conclude that it was not error for the Tax Court to appraise the Shenker-Penasquitos relationship by reference to these factors, or to conclude based on its findings in this regard that Penasquitos, rather than Mr. Shenker, owned ECB.

2.

■ However, while we affirm the Tax Court's conclusion that Mr. Shenker was not an owner of ECB, we cannot agree with Mrs. Shenker's alternative argument that his claim of ownership was so baseless as to afford her the possibility of relief under the innocent-spouse rule of § 6013(e).

Section 6013(d)(3) provides that spouses who choose to file joint income tax returns are jointly and severally liable for any tax due on their aggregate income. Section 6013(e) establishes an exception to this rule for cases in which (1) a joint return contains a substantial understatement of tax attributable to "grossly erroneous items" of one spouse; (2) the other spouse did not know or have reason to know of the understatement, and (3) it is inequitable to hold the innocent spouse liable for the resulting deficiency.[5] The Tax Court rejected Mrs.

---

**4.** The Tax Court found as to the first factor that Penasquitos always operated in its own name in conducting ECB business, and maintained all ECB accounts in its own name. 50 T.C.M. at 195. As to the second factor, the Court found that Mr. Shenker, who was at most an undisclosed principal, was not bound by Penasquitos's actions, and that ECB's creditors undoubtedly looked to Penasquitos's $10 million in assets as the guarantee for ECB's liabilities. *Id.* With regard to the third factor, the Court found that Penasquitos transmitted no receipts to Mr. Shenker, placing them instead in its own ECB accounts. *Id.* at 195-196. On the fourth factor, the Court found that because Penasquitos alone actively managed ECB, ECB income was not attributable to Mr. Shenker's efforts, assets, or employees. *Id.* at 196. Finally, in applying the sixth factor, the Court concluded that Penasquitos's extensive involvement in ECB's operation and its assumption of responsibility for ECB's considerable debts were assertions of principalship rather than agency. *Id.*

**5.** Section 6013(e)(1) currently states:
   In general.—Under regulations prescribed by the Secretary, if—
   (A) a joint return has been made under this section for a taxable year,

(B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,
   (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and
   (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,
   then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.

Section 6013(e)(4) establishes a further requirement: the understatement must exceed a specified percentage of the innocent spouse's adjusted gross income (10 per cent. if the income is $20,000 or less, and 25 per cent. if the income is over $20,000).

Until § 6013(e) was amended by § 424 of the Deficit Reduction Act of 1984 (the Act), Pub.L. No. 98-369, 98 Stat. 494 (1984), it provided protection only where there had been an understatement of gross income, and not where, as in

Shenker's attempt to invoke § 6013(e) on the ground that the ECB deductions were not grossly erroneous items, and consequently found it unnecessary to address the remaining requirements for § 6013(e) relief. 50 T.C.M. at 199.

We concur in the Tax Court's assessment. A "grossly erroneous" deduction is one "for which there is no basis in fact or law." § 6013(e)(2). While Mr. Shenker did not prevail on his claim that he owned a portion of ECB, his claim of ownership was not entirely groundless. Facts supporting Mr. Shenker's claim include the existence of the March 21, 1966 "agency agreement" between Penasquitos, Kahn, and Mr. Shenker, the April 4, 1967 agreement between the same parties, and the agency agreement between the Title Company and Wyman, Rich, and Mr. Shenker. His claim was further supported by his efforts at obtaining loans for ECB and his personal guarantees that the loans obtained would be repaid.

We therefore affirm the Tax Court's rejection of Mrs. Shenker's request for § 6013(e) relief as to the ECB deductions.[6]

## II.

■ In the second case, the Tax Court disallowed a deduction claimed on the Shenkers' 1971 joint return for the loss of securities held on Mr. Shenker's account at a brokerage firm that he was unable to recover when the firm went bankrupt in 1972. 48 T.C.M. (CCH) 164 (1984). The Tax Court found that under § 165 of the

Code Mr. Shenker was not entitled to claim the deduction in 1971 because the loss was suffered in 1972 rather than 1971.

## A.

The securities in question were held on Mr. Shenker's account with White & Company, a St. Louis, Missouri brokerage firm in which Mr. Shenker was a shareholder. In November 1970, Mr. Shenker executed an agreement subordinating his claims to the stock held on his account to the claims of present and future White & Company creditors arising before November 1971, and providing that he would not withdraw his stock from the account before November 1971. The purpose of this agreement was to meet the Securities and Exchange Commission's (SEC) and the New York Stock Exchange's capital requirements. In April 1971, Mr. Shenker executed a second such agreement with White & Company. This second agreement, which was to expire in April 1972, was to enable White & Company to meet the capital requirements of the Midwest Stock Exchange and the SEC. Mr. Shenker entered these agreements because White & Company was experiencing financial difficulties, and he wished to prevent its bankruptcy.

White & Company's efforts in 1971 and early 1972 to use Mr. Shenker's subordination agreements and those of others to meet SEC requirements were unsuccessful. Instead, in March 1972, the Securities Investor Protection Corporation commenced a proceeding for liquidation of White & Com-

---

the present case, a deduction had been improperly claimed. As amended, § 6013(e) extends to any kind of "understatement of tax" meeting the other criteria; § 424(c) of the Act renders this amendment retroactively applicable to all taxable years governed by the Internal Revenue Code of 1954 in any case still pending at its enactment, bringing the present case within its purvey.

**6.** Mrs. Shenker, citing *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), argues in both cases before us today that the United States Tax Court cannot properly adjudicate her tax liability because it is not constituted under Article III of the Constitution. Courts before and after *Northern Pipeline* have

uniformly upheld the constitutionality of the Tax Court, *e.g., Knoblauch v. Commissioner,* 749 F.2d 200, 202 (5th Cir.1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 95, 88 L.Ed.2d 78 (1985); *Sparrow v. Commissioner,* 748 F.2d 914, 915 (4th Cir.1984); *Redhouse v. Commissioner,* 728 F.2d 1249, 1253 & n. 2 (9th Cir.), *cert. denied,* 469 U.S. 1034, 105 S.Ct. 506, 83 L.Ed.2d 397 (1984); *Ginter v. Southern,* 611 F.2d 1226, 1229 & n. 2 (8th Cir. 1979), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2946, 64 L.Ed.2d 827 (1980); *Stix Friedman & Co., Inc. v. Coyle,* 467 F.2d 474 (8th Cir.) (per curiam), *aff'g* 340 F.Supp. 4 (E.D.Mo.1972), and we see no substance in Mrs. Shenker's argument that *Northern Pipeline* calls the constitutionality of the Tax Court into question.

pany, applying for and obtaining an order adjudicating that the firm's customers needed protection under the Securities Investor Protection Act of 1970 (SIPA), 15 U.S.C. § 78aaa *et seq.*

SIPA affords two sorts of protection to customers of brokerage houses: First, it guarantees payment of the customer's claims up to $50,000 and second, it provides for return to the customer of his "specifically identifiable property" held by the house at liquidation. In June 1972, Mr. Shenker filed under SIPA for the return of 19 different issues of stock held on his White & Company accounts. Before June 1972, he had made no formal demand on White & Company for return of these stocks, though he had discussed getting the stock back with an employee of White & Company in 1971. The trustee in the liquidation opposed Mr. Shenker's claims, and they were ultimately rejected by this Court in 1976 when we held that the subordination agreements precluded granting Mr. Shenker SIPA's protections. *SEC v. White & Co., Inc.*, 546 F.2d 789 (8th Cir.1976).

On their joint return for 1971, Mr. and Mrs. Shenker claimed an ordinary loss with respect to the stock in the White & Company account, excluding from the amount claimed $50,000 that Mr. Shenker expected to recover under SIPA. The Tax Court, emphasizing that White & Company remained a viable company until forced into liquidation in March 1972, and that Mr. Shenker never formally demanded return of the stock until June 1972, concluded that no identifiable event had occurred in 1971 upon which Mr. Shenker sustained a loss with respect to the stock. 48 T.C.M. at 166–67. The Tax Court also concluded that, by virtue of his SIPA claims, Mr. Shenker had a reasonable prospect of recovery of the stock in 1971. *Id.* at 167. It therefore concluded that under § 165(a) he had suffered no loss that he was entitled to claim on his 1971 return. *Id.* Finally, in a supplemental order, the Tax Court denied Mrs. Shenker's request for innocent-spouse relief under § 6013(e), holding that since the loss had in fact occurred at some point,

the issue was merely one of timing, and the claim was not "grossly erroneous."

### B.

Mrs. Shenker's sole argument as to this case is that the Tax Court erred in denying her § 6013(e) innocent-spouse relief on the ground that deduction was not "grossly erroneous." We agree with her position.

Section 165(a) permits deductions only for losses "sustained during the taxable year." Therefore, for there to be some "basis in fact or law," § 6013(e)(2), for a deduction under § 165(a), there must be some basis not only for claiming that a loss occurred, but also for claiming that it was sustained during the taxable year in question. In the present case, the findings of the Tax Court discussed above make clear that there was simply no basis upon which Mr. Shenker could claim that the loss of his stock occurred in 1971, rather than some later year. We therefore reverse the decision of the Tax Court on this issue, and remand the case for consideration of whether Mrs. Shenker meets the remaining requirements for relief under § 6013(e).

### III.

We conclude that the Tax Court's application of the *National Carbide* factors in determining whether Penasquitos acted as Mr. Shenker's agent in operating ECB was proper. We also concur in its conclusion that there was sufficient basis for Mr. Shenker's ECB deductions to bar § 6013(e) relief for Mrs. Shenker as to those deductions. However, we hold that the Tax Court erred in concluding that the 1971 stock-loss deductions were not grossly erroneous. Accordingly, the decision of the Tax Court as to the ECB deductions is affirmed, but its decision as to § 6013(e) relief for the stock loss deductions is reversed, and that case is remanded for further proceedings consistent with this opinion.