SUNDANCE RANCHES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sundance Ranches, Inc. v. Commissioner
Docket No. 34439-83
United States Tax Court
T.C. Memo 1988-535; 1988 Tax Ct. Memo LEXIS 564; 56 T.C.M. (CCH) 695; T.C.M. (RIA) 88535; November 21, 1988; As amended November 28, 1988 Alfred R. Westfall and Gregory A. Wedner, for the petitioner. Lynda B. Taylor, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies of $ 418,533, $ 788,717, and $ 716,009 in petitioner's corporate Federal income taxes for 1977, 1978, and 1979, respectively. Respondent also determined additions to tax for fraud under section 6653(b) [1] in the amounts of $ 209,266, $ 394,358, and $ 358,004, respectively. After a partial trial, respondent conceded the additions to tax for fraud. *566 The primary issue in this case is whether petitioner is taxable on income from certain land sales or was merely effecting such sales as the agent of a grantor trust known as Sundance Ranches. If we conclude that petitioner was taxable on income from the land sales, we must decide whether petitioner is entitled to report that income under the installment sale method. This case was consolidated for trial with that of William Malis (Malis) and Sharon Malis, docket No. 33747-83. Adjustments to the liability of the taxpayers in docket No. 33747-83 included disallowance of losses from land sales claimed by Malis as a grantor of the Sundance Ranches grantor trust. After partial trial, the parties agreed to resolve between themselves the amount of income received from land sales during the years in issue and the amount of deductions for substantiated expenses. Docket No. 33747-83 was severed for resolution of unrelated issues after the parties agreed that our determinations in this case would also bind the grantors of the Sundance Ranches trust. If we decide that petitioner was merely an agent of the grantor trust and was not taxable on the income in question, we must decide whether *567 Malis is required to report his ratable share of trust income and expenses consistent with his own method of accounting, i.e., the cash method, pursuant to sections 671 through 677 and the regulations thereunder. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioner was incorporated on or about April 26, 1974, as an Oregon corporation. At all material times, Gary Clawson (Clawson) was the president and sole shareholder of petitioner. Petitioner's principal office at the time of filing the petition was in Bend, Oregon. Sundance Meadows
On or about January 10, 1972, Clawson as buyer entered into a written contract to purchase from Cameron Cliff (Cliff) as seller approximately 2,700 acres of land constituting a producing ranch in Deschutes County, Oregon. The total purchase price was $ 325,000, with a $ 40,000 cash down payment. The balance of $ 285,000 was to be paid in annual installments of $ 20,357.14, credited first to accrued interest and then to reduction of principal. The written contract between Cliff and Clawson included the following provision: ASSIGNMENT: *568 Buyer shall not sell or assign Buyer's interest in this Contract or the property herein contracted to be sold without the written consent of Seller having been first obtained; provided, however, consent of the Seller shall not be unreasonably withheld. Because Clawson intended to subdivide the property, a deed release clause as incorporated into the contract. The deed release clause provided that the seller would issue a deed upon payment of an amount equal to 32 percent of a minimum selling price of $ 800 per acre. The contract also gave to the seller the right to foreclose and declare the entire unpaid balance immediately due and payable in the event of the buyer's default. Commencing in 1972, Clawson subdivided lots and sold them to individual purchasers, paying Cliff $ 250 per acre and receiving a deed pursuant to the deed release clause. Clawson, however, had problems making timely payments under the contract and was consistently delinquent. Cliff considered foreclosing against Clawson. On September 19, 1977, Cliff and Clawson executed an Amendment to Contract of Sale. The amendment provided in pertinent part: 1. Buyer will pay to Seller the sum of $ 100,000.00, *569 on October 1, 1977. 2. Seller has deeded to Buyer the land described on Exhibit "B" hereto, which are known as the "Sundance Meadows Lands". 3. Buyer will pay to Seller not less than the sum of $ 150,000.00 on or before April 15, 1978, such sum to be applied first against interest and thereafter against principal. 4. Thereafter Buyer will pay to Seller not less than the sum of $ 20,000 per year, plus interest to date, the first of such amounts to be paid on or before April 15, 1979, and thereafter a like sum on the 15th day of April of each year until the full unpaid balance of principal and interest has been paid. 5. Except as expressly provided herein, the Contract of Sale between the parties, dated January 10, 1972, shall remain in full force and effect. Exhibit "B" contained a legal description of the property known as Sundance Meadows, which consisted of approximately 900 acres of the 2,700 acres that had been the subject of the 1972 contract. Cliff executed a warranty deed in favor of Clawson, dated September 20, 1977, and recorded with the Deschutes County Recorder's office on September 21, 1977. The consideration stated in the warranty deed from Cliff *570 to Clawson was $ 100,000. On September 22, 1977, Clawson transferred Sundance Meadows to petitioner, and the warranty deed reflecting this transfer was recorded with the Deschutes County Recorder's office on September 27, 1977. The consideration stated in the warranty deed from Clawson to petitioner was $ 100,000, although petitioner did not pay Clawson anything for the property. Relationship among Petitioner, Clawson, and the Sundance Ranches Grantor Trust
Starting in about 1974, Clawson sought financing in order to subdivide the Sundance Meadows property. Clawson met Malis through Clawson's father-in-law, George Rowland, in 1974, and gave Malis a copy of a prospectus for the proposed Sundance Meadows undivided interest development. Malis was an attorney. He discussed the project with one of his clients, Robert Grant (Grant), and Grant's financial advisor, Robert Graves. On or about November 7, 1974, Malis and Grant executed a Memorandum of Trust and Association in which they agreed to provisions including the following: 1. Business
To voluntarily associate themselves in the respective capacities, as hereinafter set forth, for the purpose of conducting *571 the general business of ranching, recreational land sales and such kindred lines as may pertain to the same. 2. Name
The name of the Trust and Association shall be SUNDANCE RANCHES. 3. Term
This Trust and Association shall commence on the execution of this Agreement and shall continue until revoked by ROBERT A. GRANT, dissolved by mutual agreement, or upon the expiration of ten (10) years from the date hereof. 4. Place of Business
The principal place of business shall be Bend, Oregon. 5. Corpus
The corpus of this Trust and Association shall be as required from time to time in furtherance of the business of the Association in ratio to each associate's share in the profits and losses as hereinafter provided. 6. Profits and Losses
Any net profits or losses that may accrue to the Trust and Association shall be distributed to or borne by each associate in the following proportions: ROBERT A. GRANT
85%
WILLIAM A. MALIS
15%
* * * 8. Accrual Basis of Accounting
At all times during the continuance of this Trust and Association, the associates shall keep accurate books of account in which all matters relating to the *572 Trust and Association, including all income, expenditures, assets, and liabilities thereof, shall be entered. Said books shall be kept on an accrual basis and shall be open to examination by any associate at any time. * * * 11. Time Devoted
WILLIAM A. MALIS, Trustee, shall devote as much time and attention as is necessary and use the utmost of his skills and ability in the furtherance of the Trust and Association business. 12. Management and Legal Authority
Each associate shall have an equal voice in the management of the Trust and Association and shall have authority to bind the Trust and Association in making contracts and incurring obligations in the name and on the credit of the Trust and Association except that WILLIAM A. MALIS shall be the active associate in the management of the Trust and Association and is specifically authorized to engage agents, give powers of attorney and to conduct the affairs of the Trust and Association through such agents and persons and in such manner as he shall deem advisable from time to time. In connection with such activity, WILLIAM A. MALIS shall act as a Trustee in accordance with fiduciary standards of care and prudence. *573 Upon the death, inability or unwillingness of WILLIAM A. MALIS to act as Trustee, the ROBERT A. GRANT shall be the Trustee. Grant provided Malis with $ 225,000 in 1975 in relation to Sundance Ranches. In March 1975, Clawson, using the fictitious name, Cameron Cliff Land Company, and Malis, using the name Sundance Ranches, executive a document entitled Contract of Sale. They dated the document "this 10th day of January, 1975." The document included the following provisions: CONTRACT OF SALE
PARTIES: SELLER: CAMERON CLIFF LAND COMPANY BUYER: SUNDANCE RANCHES AGREEMENT: Seller agrees to sell and Buyer agrees to buy the real property and its appurtenances described in Exhibit "A" attached hereto and hereby incorporated by this reference, together with the improvements on the ranch located on said real property. PURCHASE PRICE: $ 2,000,000 PAYMENT TERMS: Interest only at the rate of ten percent (10%) per annum for a period of five (5) years from the date hereto. Principal and interest payable in five (5) equal annual installments commencing January 10, 1981, all due and payable January 10, 1986. INTEREST RATE: Ten percent (10%) per annum, commencing *574 the 10th day of January, 1975, on the unpaid balance. * * * WARRANTY OF POSSESSION: Buyer shall be entitled to possession of the real property on the execution of this Agreement and shall have the right to remain in possession so long as Buyer is not in default under the terms of this contract. * * * BUYER'S DEED: When the Buyer pays and performs this contract in full, Seller shall give to Buyer, and Buyer's heirs or assigns, a good and sufficient Warranty Deed conveying good and merchantable title in fee simple, free and clear of encumbrances excepting liens and encumbrances suffered or permitted by the Buyer or Buyer's heirs or assigns, and save and except Reservations in Patents, Easements and Restrictions of record. On April 3, 1976, Clawson and Malis executed a power of attorney that recited in part: That I, William A. Malis, for myself and on behalf of Sundance Ranches hereby make, constitute and appoint Gary Clawson my/our true and lawful Attorney to act upon these matters in such manner as follows: 1. To subdivide, manage, develop, sell and otherwise deal with the real property known as Sundance Ranches and to execute legal documents incident to the sale *575 of partnership interests in the said property. 2. To make deposits into and make draws from the account of William A. Malis #1655-1 located at the First National Bank of Oregon Bend, Oregon. This Power of Attorney is irrevocable. The power of attorney was recorded with the County of Deschutes, Oregon, on April 13, 1976. Also on April 3, 1976, Clawson and Malis executed a document entitled "Contract of Sale" reciting that it was "Effective the 10th day of January, 1975." By the document, Malis agreed to buy from Clawson for $ 2 million the real property constituting Sundance Meadows, "together with the sprinkling system on the ranch located on said real property" and certain machinery and equipment described in an attached exhibit. Also on April 3, 1976, Clawson executed an "Assignment of Land Sale Contract" in which he assigned to Malis the contract between Clawson and Cliff. The assignment recited an effective date of January 10, 1975. In various filings with the Oregon Department of Commerce Real Estate Division, Clawson represented that petitioner was the subdivider-developer and owner of record of Sundance Meadows and that Clawson was its agent. For example, *576 in a document signed under oath by Malis and Clawson in April 1976, Malis was identified as the subdivider, petitioner was identified as the developer, Cliff was identified as the owner of record, and Clawson was identified as the agent. A portion of the form directed the informant to "Describe what financing plan was used by you in purchasing this property for subdivision purposes * * * (If secondary financing was used or provided for, give details)." The following was inserted: "Land sale contract from Cameron Cliff to Gary Clawson and assignment from Gary Clawson to William A. Malis." The informant was further directed to "Describe fully any other plan of financing or encumbrance which is not covered above, and with whom, in connection with the property." Inserted on the form was "There are no other financing plans." At no point in the application did Malis or Clawson refer to either the contract of sale between Clawson and Malis or the Contract of Sale between Cameron Cliff Land Company and Sundance Ranches. The Sundance Ranches grantor trust was not referred to in the documents. On June 3, 1976, the State of Oregon, Department of Commerce Real Estate Division, issued a Subdivision *577 Public Report for Sundance Meadows. Malis was shown as the "original subdivider." Petitioner was shown as the "developer." Sundance Ranches, as client, and Clawson, as manager, entered into a "Management Services Agreement" for the period commencing January 15, 1976, and ending December 31, 1977. The date of execution of the agreement is unknown, but it was subsequent to the effective date. Under the said agreement, Clawson was entitled to an annual fee of $ 200,000 payable on December 31 of each affected year and to reimbursement of certain expenses. On the Sundance Ranches grantor trust information returns, accrued management fees were claimed as deductions in the amount of $ 200,000 for 1977, $ 300,000 for 1976, and $ 300,000 for 1979. The grantor trust did not pay any of the management fees in 1976, 1977, 1978, 1979, or 1980. Income (loss) from sales of parcels in Sundance Meadows was reported on the Sundance Ranches grantor trust Federal income tax returns as follows: 1977
Sales ($ 468,801 less deferred
gain I.R.C. sec. 453)
$ 277,536
Miscellaneous income
6,877
Total sales
$    284,413 Cost of sales - Land
90,417
- Other
841,737
Depreciation
77,812
1,009,966 Net Loss
($    725,553)
*578 1978
Sales ($ 1,521,259 less deferred
gain I.R.C. sec. 453)
$    816,450
Deferred gain - prior year sales
11,209
Interest income
27,524
Total income
$    855,183 Cost of Sales - Land
274,200
- Other
1,397,088
Depreciation
70,275
1,741,563 Net Loss
($    886,380)
1979
Sales ($ 1,379,600 less
deferred gain I.R.C. sec. 453
and prior year collections)
$    755,257
Interest received
89,893
$    845,150 Cost of Sales
1,885,841
Depreciation
346,237
2,232,078 Net Loss
($ 1,386,928)
On the Sundance Ranches grantor trust returns, accrued interest expense of $ 200,000 was claimed for each of the years 1977, 1978, 1979. None of the accrued interest expense was paid in 1977, 1978, 1979, or 1980. Clawson first reported interest income from Malis and Grant in 1982 in the amount of $ 500,000, after an investigation of Malis by the Internal Revenue Service had begun. During the years in issue, Clawson expressly or impliedly represented to purchasers of Sundance Meadows undivided interests, petitioner's bookkeeper, and Clawson's daughter, *579 who was employed by petitioner, that Sundance Meadows was owned by Clawson or by petitioner as Clawson's corporation. Approximately 1,200 sales of undivided interests in Sundance Meadows during the years in issue were effected by warranty deeds and memoranda of sale listing petitioner as the grantor/seller of the property. On a balance sheet prepared for Clawson d/b/a Sundance Land & Livestock Company, as of February 28, 1976, the following note was appended to a liability of $ 190,000 shown as "Ranch Contract": Contracts pledged to Wm. Malis, Attorney Trustee to Collateralize $ 225,000.00 loan on a long term basis. This loan also has as collateral 19 lots in Sundance East, Phase III. Terms of this loan are 2473.09 per month until August 1976 then 3061.57 until paid. Deposit of $ 100,000 in a savings account at Bend Branch of First National Bank under the joint signatures of Wm. Malis and Gary Clawson being disbursed as needed for the completion of $ 100,000 improvements on the Ranch for "undivided interest" amenities. * * * Wm. Malis Trustee has an option to purchase Ranch comprising 1000 acres more or less for $ 2,000,000, applying the $ 225,000 as a down payment. This option *580 contingent upon the outcome of sale of undivided interests. Projections of income on the sale of undivided interest total $ 6,000,000. OPINION Whether Petitioner Had Income From Land Sales
Respondent determined that the gross receipts from sales of parcels in Sundance Meadows constituted income to petitioner, consistent with the recorded warranty deeds and memoranda of sale listing petitioner as the grantor/seller of the parcel. Respondent contends that the purported sale between Clawson and the Sundance Ranches grantor trust was a sham transaction, created solely to avoid income taxes. Petitioner contends that it was merely an agent for the Sundance Ranches grantor trust and that respondent's allegations of sham and factual arguments in support of those allegations arise solely from animus toward Malis. There is one glimmer of agreement set forth in petitioner's brief as follows: Petitioner has no quarrel, however, with Respondent's reference to Moline Properties, Inc. v. Commissioner,319 U.S. 436 (1943) and National Carbide Corp. v. Commissioner,336 U.S. 422 (1949) as decisions instructive on the agency issue which is central *581 to this case. These cases discuss certain factual indicia and factors and general circumstances which should be considered in connection [sic] with a finding of corporate agency. See e.g., National Carbide,336 U.S. at 437. Subsequent to the filing of briefs in this case, the Supreme Court decided Commissioner v. Bollinger,485 U.S.    , 108 S.Ct. 1173 (Mar. 22, 1988). In this case, of course, the grantor trust did not own petitioner. The grantor trust, however, derived its interest from Clawson, who in turn owned petitioner. Clawson was the designated agent of the grantor trust, and he allegedly delegated his agency to petitioner. Under these circumstances, the factors discussed and established by the Supreme Court appropriately may be applied here in determining whether petitioner corporation operated solely as an agent and did not have income. See Shenker v. Commissioner,804 F.2d 109, 112-113 (8th Cir. 1986), affg. a Memorandum Opinion of this Court. In this regard, petitioner has the burden of proving that respondent's determination that it had income is erroneous. Rockwell v. Commissioner,512 F.2d 882 (9th Cir. 1975), *582 affg. a Memorandum Opinion of this Court; Rule 142(a), Tax Court Rules of Practice and Procedure.
In Commissioner v. Bollinger, supra, a corporation had been formed to hold title to property as the nominee and agent, solely to secure financing without being subject to Kentucky usury law limits on interest rates charged to noncorporate borrowers. The parties agreed that if a corporation held title to property as agent for a partnership, then for tax purposes the partnership and not the corporation was the owner. They disputed whether the corporation satisfied certain criteria of agency under the rule of National Carbide Corp. v. Commissioner,336 U.S. 422 (1949), in which the Supreme Court concluded that three corporations that were wholly owned subsidiaries of another corporation were not really agents. The Supreme Court: acknowledged, however, that there was such a thing as "a true corporate agent * * * of [an] owner-principal," id., at 437, and proceeded to set forth four indicia and two requirements of such status, the sum of which has become known in the lore of federal income tax law as the "six National Carbide *583 factors": "[1] Whether the corporation operates in the name and for the account of the principal, [2] binds the principal by its actions, [3] transmits money received to the principal, and [4] whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. [5] If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case. [6] Its business purpose must be the carrying on of the normal duties of an agent." Id., at 47 (footnotes omitted). We readily discerned that these factors led to a conclusion of nonagency in National Carbide itself. There each subsidiary had represented to its customers that it (not the parent) was the company manufacturing and selling its products; each had sought to shield the parent from service of legal process; and the operations had used thousands of the subsidiaries' employees and nearly $ 20 million worth of property and equipment listed as assets *584 on the subsidiaries' books. Id., at 425, 434, 438, and n. 21. [Bollinger vl Commissioner, 485 U.S. at    .] In Bollinger, the Supreme Court rejected the contention of the Commissioner that the last two so-called National Carbide factors were not satisfied. After finding that those requirements, when reasonably construed, had been met in Bollinger, the Court concluded: In any case, we decline to parse the text of National Carbide as though that were itself the governing statute. As noted earlier, it is uncontested that the law attributes tax consequences of property held by a genuine agent to the principal; and we agree that it is reasonable for the Commissioner to demand unequivocal evidence of genuineness in the corporation-shareholder context, in order to prevent of evasion of Moline. We see no basis, however, for holding that unequivocal evidence that only consist of the rigid requirements (arm's-length dealing plus agency fee) that the Commissioner suggests. Neither of those is demanded by the law of agency, which permits agents to be unpaid family members, friends, or associates. See Restatement (Second) of Agency secs. 16 *585 , 21, 22 (1958). It seems to us that the genuineness of the agency relationship is adequately assured, and tax-avoiding manipulation adequately avoided, when the fact that the corporation is acting as agent for its shareholders with respect to a particular asset is set forth in a written agreement at the time the asset is acquired, the corporation functions as agent and not principal with respect to the asset for all purposes, and the corporation is held out as the agent and not principal in all dealings with third parties relating to the asset. * * * [485 U.S. at    .]
An outstanding factor considered throughout the Bollinger opinion is that the corporation had been disclosed as the agent in all of its dealings with third parties. The partnership in each instance was identified as the principal and owner of the subject property to lenders, contractors, manager, employees, and tenants. In all sales transactions involved in this case, the persons who acquired the Sundance Meadows parcels acquired them by warranty deeds and other documents in the name of petitioner. If they were told anything else about who the seller was, they were told that Clawson, petitioner's *586 shareholder, was the owner of Sundance Meadows. The corporation was not held out as an agent in its dealings with third parties. Petitioner contends that the documents of sale between Clawson and the Grantor trust were not recorded in order to avoid an increase in real property taxes. Petitioner notes that the grantor trust was disclosed as the principal on certain subdivision reports listing Malis as "original subdivider" and petitioner as "developer." Clawson was listed as "agent." Those designations, however, do not convey the impression that Malis or the grantor trust was a principal and petitioner was an agent. No reference was made to the grantor trust. To the contrary, the term "developer" implies the conduct of an active business by the corporation rather than the mere nominee role of holding title involved in Bollinger and prior cases. Development of property is not among "the normal duties of an agent"; a developer typically acts for its own account. There is no evidence in this case that the grantor trust was bound by petitioner's actions; that petitioner transmitted more than a part of the income in question to the grantor trust; or that the income was attributable *587 to the assets and employees of the grantor trust. Efforts of petitioner to bring itself within the scope of Bollinger must fail. Petitioner has not persuaded us that a true agency existed between the corporation and the grantor trust. See Riverfront Groves, Inc. v. Commissioner,60 T.C. 435, 446 (1973); Swope v. Commissioner,51 T.C. 442, 453-455 (1968). [2]
Petitioner in its brief "certainly concedes that not every 'i' was dotted or 't' crossed in writings related to the transactions, and that, after 12 years from the date of the purchase and development of Sundance Meadows, to the date of trial in 1987, the record is not entirely perfect." Petitioner understates by a substantial margin the unsatisfactory state of petitioner's records. The land sales were consistently cast in a form whereby petitioner was the seller of property and the recipient of payments from purchasers. Respondent is understandably suspicious about petitioner's sloppy practices and semi-secret agreements, particularly given Malis' training as *588 a lawyer. We need not adopt, however, respondent's characterizations to conclude that petitioner and the grantor trust should suffer the consequences of their own voluntary acts and omissions, if indeed a mere agency relationship were intended. Regardless of our disposition of petitioner's agency argument, we conclude that petitioner realized income from the sale of parcels in Sundance Meadows. Respondent asks that we totally disregard the purported sale transaction between Clawson and the grantor trust because it was without economic substance. Petitioner, in effect, asks that we give effect to that transaction and disregard the form of the sales by petitioner to purchasers in Sundance Meadows. The most logical inference from the facts is that the substance of the transaction between Clawson and the grantor trust was a financing arrangement, in which the lender, the grantor trust, sought to obtain certain tax benefits without undertaking the burdens of ownership. Clawson's testimony suggests that he did not want to sell the property but needed financing and that it was necessary "to come up with some kind of a plan whereby the property could not be held as collateral." The *589 subsequent conduct of Clawson's daughter, was inconsistent with a bona fide sale as well as with a true agency relationship. The evidence further suggests that the grantor trust was interested only in net after tax returns from the transaction and not in taxable profits. We need not go so far as to characterize the transaction as sham in order to conclude that it has been mischaracterized for tax purposes. See Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1242-1244 (1981); Estate of Franklin v. Commissioner,64 T.C. 752 (1975), affd. on different grounds 544 F.2d 1045 (9th Cir. 1976). The management agreement and the purported sale contract, to which the parties only partially adhered, can then be understood as disguised guarantees that the proceeds of sales would be distributed in an agreed upon manner. An arrangement for distribution of proceeds, however, does not prove a sale. The existence of documents suggesting a sale by Clawson to Malis is not persuasive. We have frequently concluded that there was no sale of property notwithstanding transfer of formal legal title. See, e.g., Karme v. Commissioner,673 F.2d 1062 (9th Cir. 1982), *590 affg. 73 T.C. 1163 (1980); Falsetti v. Commissioner,85 T.C. 332 (1985), cases relied on by respondent. The Supreme Court has established the basic principle that taxation is concerned with "actual command over the property taxed -- the actual benefit for which the tax is paid" and has "refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of property where the transferor continues to retain significant control over the property transferred." Frank Lyon Co. v. United States,435 U.S. 561, 573 (1978), quoting Corliss v. Bowers,281 U.S. 376, 378 (1930). Under the facts and circumstances of this case, we conclude that the significant control over the property, i.e., the use of that property to earn income, was in petitioner, acting through its agent Clawson. The grantor trust was merely entitled to compensation for its role in providing operating capital. Petitioner was, therefore, taxable on the earnings. See Moline Properties, Inc. v. Commissioner,319 U.S. 436, 438 (1943) citing Burnet v. Commonwealth Improvement Co.,237 U.S. 415, 418 (1932); *591 Strong v. Commissioner,66 T.C. 12, 22-26 (1976), affd. without published opinion 553 F.2d 94 (2d Cir. 1977). Whether Petitioner May Elect Installment Sale Treatment
Petitioner contends that, if we sustain respondent's determination that it had income from land sales, it may elect to report that income on an installment sale basis. During the years in issue, section 453(b) [3] required taxpayers to affirmatively elect to use the installment method for reporting gains from sales of real property. Belated elections were the subject of a variety of cases which have been summarized in a recent opinion in Gibson & ABC, Inc. v. Commissioner,89 T.C. 1177, 1182-1191 (1987). In cases where a sale was reported on a return under a valid method inconsistent with installment reporting, later election of the installment method was precluded. See, e.g., Pacific National Co. v. Welch,304 U.S. 191 (1938). In cases in which a transaction was recorded in some fashion on a return but was erroneously categorized as something other than a sale, the taxpayer's election of a method of reporting gain was held to be not binding. *592 See, e.g., Mamula v. Commissioner,346 F.2d 1016 (9th Cir. 1965), revg. 41 T.C. 572 (1964). In cases where no payment was received in the year of sale, an election was permitted by an amended or late return. See, e.g., F.E. McGillick Co. v. Commissioner,42 T.C. 1059 (1964). In Gibson, however, the taxpayers had reported a sales transaction on their returns for 1980 and elected the closed transaction method of reporting. On audit, it was determined that the sale occurred and that partial payment was received in 1979. We held that the taxpayers had made a binding election and were precluded from switching to the installment method of reporting their gain. *593 In this case, petitioner received consideration in the year of sale but did not report the sales in any manner on its returns. Respondent argues that petitioner's belated attempt to elect the installment sale method cannot be permitted because petitioner did not act in good faith. See Royster v. Commissioner,820 F.2d 1156, 1157 (11th Cir. 1987), affg. a Memorandum Opinion of this Court; Marcello v. Commissioner,380 F.2d 499, 508 (5th Cir. 1967). The Court of Appeals for the Ninth Circuit has also indicated that whether the late election of the installment method is permitted will depend on whether the method originally chosen, and later conceded to have been improper, was advanced in good faith and accompanied by a full disclosure of the transaction in the year of sale. Mamula v. Commissioner,346 F.2d at 1018-1020. Petitioner asserts that respondent cannot claim lack of good faith because respondent has conceded the addition to tax for fraud and not asserted an addition to tax for negligence. The concession for fraud, however, followed trial and the Court's comments after trial about the lack of clear and convincing evidence *594 of fraud. At that point in the proceedings, after respondent was aware of the probable disposition of the fraud issue, the Court would not have permitted respondent alternatively to claim an addition to tax for negligence. If negligence were in issue, we might well sustain an addition to tax. We are not persuaded that petitioner is entitled to the benefit of rules applicable to taxpayers who report a transaction at the time payment is received, advance a method of reporting income in good faith, and later concede it to have been improper. Petitioner in this case is more in the position of a taxpayer who attempts to use hindsight to correct an unfortunate choice of reporting, as in Mamula v. Commissioner,346 F.2d at 1018, or who deliberately attempts to shift the tax consequences of sales, as in Royster v. Commissioner, supra. Petitioner is not entitled to now elect the installment method of reporting. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect during the years in issue, except as otherwise noted.↩
2. See also Shenker v. Commissioner,T.C. Memo. 1985-301, affd. 804 F.2d 109↩ (8th Cir. 1986).
3. (b) Sales of Realty and Casual Sales of Personalty. -- (1) General rule. -- Income from -- (A) a sale or other disposition of real property, or (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $ 1,000, may (under regulations prescribed by the Secretary) be returned on the basis and in the manner prescribed in subsection (a). (2) Limitation. -- Paragraph (1) shall apply only if the taxable year of the sale or other disposition -- (A) there are no payments, or (B) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price. (3) Purchaser evidences of indebtedness payable on demand or readily tradable. -- In applying this subsection, a bond or other evidence of indebtedness which is payable on demand, or which is issued by a corporation or a government or political subdivision thereof (A) with interest coupons attached or in registered form (other than one in registered form which the taxpayer establishes will not be readily tradable in an established securities market), or (B) in any other form designed to render such bond or other evidence of indebtedness readily tradable in an established securities market, shall not be treated as an evidence of indebtedness of the purchaser.↩